OPINION
By the Court,
Parraguirre, J.:
In this appeal, we address whether baseball stadium owners and operators have a duty to protect spectators against injuries caused by foul balls that are errantly projected into the stands. We conclude that stadium owners and operators have a limited duty to protect against such injuries and that respondent satisfied its duty as a matter of law under the facts presented in this case. Accordingly, we affirm the district court’s judgment in respondent’s favor.

FACTUAL AND PROCEDURAL BACKGROUND

At all times relevant to this appeal, respondent Mandalay Sports Entertainment, LLC, owned and operated the Las Vegas 51s, a minor league baseball team that plays its home games at Cashman Field in Clark County. From 2000 to 2002, appellants Kathleen and Michael Turner owned season tickets for home games played by the 51s.
Like most professional baseball teams, the 51s include a disclaimer on their tickets informing fans that the team is not responsible for injuries caused by foul balls.[1] In addition, the public address announcer at Cashman Field warns the crowd about the danger of foul balls hit into the stands before each 51s home game. The 51s also post warning signs at every Cashman Field entry gate, cautioning fans to stay alert because of the risks posed by foul balls. The Turners acknowledge that they were aware of these warnings.
On May 4, 2002, while attending a 51s game at Cashman Field, Mr. and Mrs. Turner left their assigned seats and walked to the “Beer Garden,” a concessions area located in the upper concourse level above the stands. The Beer Garden — which is several hundred feet from the playing field — contains tables and chairs where pa *216 trons can eat and drink but also has a railing where patrons can stand and continue to watch the game. Unlike other concession areas at Cashman Field, the Beer Garden has no protective screen surrounding it.[2]
While at the Beer Garden, Mr. Turner purchased a beverage for himself and a sandwich for his wife. Mr. Turner then stood at the railing so that he could continue to watch the game. Mrs. Turner, on the other hand, took her sandwich and sat at one of the available tables. According to Mrs. Turner, she was unable to see any part of the field from her table.
As Mrs. Turner sat in the Beer Garden, a foul ball struck her in the face. The force of the ball’s impact rendered her unconscious, broke her nose, and lacerated her face. According to Mrs. Turner, she never saw the ball coming and had no opportunity to get out of the way.
The Turners subsequently filed a complaint in district court against the Las Vegas 51s, alleging three causes of action: negligence, loss of consortium, and negligent infliction of emotional distress (NIED). While the negligence action pertained to Mrs. Turner’s alleged injuries, the loss of consortium and NIED claims pertained to Mr. Turner’s alleged injuries.
In response to the Turners’ complaint, the 51s filed a motion for summary judgment, which the Turners opposed. After considering the parties’ arguments, the district court granted the 51s’ motion, concluding that the team “did not breach any duty of care to Plaintiffs to protect them from harm [and] . . . even if there were any such duty, the [foul] ball [was] a known and obvious risk.” This appeal followed.

DISCUSSION

On appeal, the Turners argue that their claims for negligence, loss of consortium, and NIED each present a genuine issue of material fact. We disagree.

Standard of review

This court reviews orders granting summary judgment de novo.[3] Summary judgment is appropriate when the parties’ pleadings and other evidence on file, viewed in a light most favorable to the non-moving party, demonstrate that no genuine issue as to any material fact remains and that the moving party is entitled to judgment as a matter of law.[4] “A factual dispute is genuine when the evidence is *217 such that a rational trier of fact could return a verdict for the non-moving party.’ ’[5]

Mrs. Turner’s negligence claim

The district court concluded that Mrs. Turner’s negligence claim failed because the Las Vegas 51s did not owe a duty to protect her from the foul ball in question. For the following reasons, we agree with the district court’s conclusion.
A claim for negligence in Nevada requires that the plaintiff satisfy four elements: (1) an existing duty of care, (2) breach, (3) legal causation, and (4) damages.[6] At issue in this case is whether the 51s owed a duty to protect Mrs. Turner from foul balls hit into the area where she was sitting. Although we have previously recognized that “a proprietor owes a general duty to use reasonable care to keep the premises in a reasonably safe condition for use,” we have never specifically defined the scope of that duty as it pertains to baseball stadium owners and operators.[7]
In addressing this issue, at least 12 jurisdictions have adopted the “limited duty rule,” which places two important requirements on stadium owners and operators.[8] First, the rule requires stadium owners and operators to provide a sufficient amount of protected seating for those spectators “who may be reasonably anticipated to *218 desire protected seats on an ordinary occasion.”[9] Second, it requires stadium owners and operators to provide protection for all spectators located in the most dangerous parts of the stadium, that is, those areas that pose an unduly high risk of injury from foul balls (such as directly behind home plate).[10]
As explained by the Michigan Court of Appeals, “the limited duty rule . . . identifies the duty of baseball stadium proprietors with greater specificity than the usual . . . standard provides.”[11] In this sense, the limited duty rule does not eliminate the stadium owner’s duty to exercise reasonable care under the circumstances to protect patrons against injury; rather, it defines that duty in detail.[12]
By defining the duty of a baseball stadium owner or operator with specificity, the limited duty rule shields the stadium owner or operator from the need to take precautions that are clearly unreasonable while also establishing the outer limits of liability.[13] Once a stadium owner or operator complies with the rule’s requirements by providing sufficient protected seating, the owner or operator has satisfied the legal duty of protection owed to its patrons. Having met this obligation, the stadium owner or operator simply has no remaining duty to protect spectators from foul balls, which are a known, obvious, and unavoidable part of all baseball games.[14] This specificity with regard to the duty imposed on the baseball stadium owner or operator serves the important purpose of limiting expensive and protracted litigation that ‘ ‘might signal the demise or substantial alteration of the game of baseball as a spectator sport.”[15]
Recognizing the importance of establishing parameters around personal injury litigation stemming from professional baseball in Nevada, we take this opportunity to expressly adopt the limited duty rule. As stated above, the limited duty rule establishes the to *219 tality of the duty owed by baseball stadium owners and operators to protect spectators from foul balls within the confines of the stadium. Applying the rule to this case, we conclude that Mrs. Turner’s negligence claim fails as a matter of law.
In this case, Mrs. Turner was injured while eating in the Beer Garden, a concessions area located several hundred feet from home plate on the top viewing level of Cashman Field. Because Mrs. Turner chose not to sit in a protected seating area, the relevant inquiry under the limited duty rule is whether the Beer Garden was one of the most dangerous areas of the ballpark or, more specifically, whether it posed “an unduly high risk of injury” from foul balls.[16]
Here, the record establishes that foul balls occasionally fly into the Beer Garden, some parts of which have an obstructed view of the field. The risk of an occasional foul ball, however, does not amount to “an unduly high risk of injury.” Indeed, Mrs. Turner has conspicuously failed to demonstrate that any other spectator suffered injuries as a result of errant balls landing in the Beer Garden. Thus, we conclude that she failed to establish a genuine issue of material fact as to the 51s’ negligence, and the 51s were entitled to judgment as a matter of law.[17]

Clarification of Mizushima v. Sunset Ranch and the implied assumption of risk doctrine

Separately, since the limited duty rule is logically related to the broader doctrine of primary implied assumption of risk,[18] we take *220 this opportunity to clarify certain strained language from this court’s decision in Mizushima v. Sunset Ranch.[19] In Mizushima, the court addressed the viability of the assumption of risk doctrine as a defense to negligence actions in Nevada. According to the court, although express assumption of risk remained a viable defense (in part because it stemmed from a contractual undertaking expressly relieving the potential defendant from liability), the implied assumption of risk doctrine failed to survive the enactment of Nevada’s comparative negligence statute.[20] Because this conclusion was based on an incorrect understanding of primary implied assumption of risk, however, we now readdress the issue.
The implied assumption of risk doctrine generally is divided into two subcategories: “primary” and “secondary.”[21] Of these subcategories, only “primary” implied assumption of risk is at issue here.[22] As commonly understood, this form of assumption of risk arises when “the plaintiff impliedly assumes those risks that are inherent in a particular activity.”[23]
In Mizushima, this court described the doctrine of primary implied assumption of risk as “a relationship voluntarily accepted with an imputed understanding that the other party has no duty to the injured plaintiff.”[24] After making this statement, however, the court mischaracterized duty as a factor “left to the jury ... in the comparative negligence analysis.”[25]
We have clearly and consistently stated — since at least 2001— that whether a duty exists is actually a question of law to be de *221 termined solely by the courts.[26] Several other courts that have recognized duty as a legal question also have recognized that the primary implied assumption of risk doctrine merely “goes to the initial determination of whether the defendant’s legal duty encompasses the risk encountered by the plaintiff.’ ’[27] These courts treat the doctrine as a part of the initial duty analysis, rather than as an affirmative defense to be decided by a jury.[28] In our opinion, this is a better application of the doctrine, and one that makes it compatible with our comparative negligence statute.[29] Accordingly, we overrule Mizushima to the extent that it held that the primary implied assumption of risk doctrine was abolished by our comparative negligence statute. Whether that doctrine bars a plaintiff’s claim should be incorporated into the district court’s initial duty analysis, and therefore it should not be treated as an affirmative defense to be decided by a jury.[30]

Mr. Turner’s loss of consortium and NIED claims

Because we affirm the district court’s summary judgment on Mrs. Turner’s negligence action, we also affirm its summary judg *222 ment on Mr. Turner’s derivative claim for loss of consortium.[31] In addition, because the 51s satisfied their legal duty in this case as a matter of law, we conclude that Mr. Turner’s NIED claim fails and that the district court did not err in granting summary judgment on that claim.[32]

CONCLUSION

Since the record demonstrates that the 51s satisfied the requirements of the limited duty rule as a matter of law, and thus no genuine issue of material fact remains with regard to Mrs. Turner’s negligence claim, we conclude that the district court was correct to enter summary judgment in the 51s’ favor on that claim. We further conclude that the district court properly entered summary judgment on Mr. Turner’s claims for loss of consortium and NIED. Accordingly, we affirm the district court’s order in all respects.
Maupin, Hardesty and Saitta, JJ., concur.

 Specifically, this notice provides that the “Holder assumes all danger incidental to the game whether occurring before, during or after the game, including the dangers of being injured by thrown bats or thrown or batted balls, and agrees that the TEAMS, their agents, and players are not liable for resulting injuries.”

 Two other concession areas at Cashman Field provide protection from stray balls: (1) the Party Zone, which has a protective screen; and (2) the Club Level Restaurant, which is fully enclosed by clear glass walls.

 Wood v. Safeway, Inc., 121 Nev. 724, 729, 121 P.3d 1026, 1029 (2005).

 Id.

 Id. at 731, 121 P.3d at 1031.

 Jordan v. State, Dep’t of Motor Vehicles, 121 Nev. 44, 74, 110 P.3d 30, 51 (2005).

 Hall v. SSF, Inc., 112 Nev. 1384, 1393, 930 P.2d 94, 99 (1996). This court considered a similar issue on appeal from a judgment following a bench trial in Berrum v. Powalisz, 73 Nev. 291, 317 P.2d 1090 (1957), where the plaintiff was struck by the end of a bat that flew through an opening in the protective screening behind home plate. There, the court framed the issue presented as one of “proximate cause” — specifically, “whether the hazard which resulted in the injury was one for which the defendants should have provided protection” or, “more narrowly, whether the minds of reasonable men could differ as to the foreseeability of the occurrence.” Id. at 292, 317 P.2d at 1091. The Berrum court affirmed the district court’s judgment in favor of the plaintiff, concluding that under the facts presented, “a reasonable man might well believe that [the flying bat] . . . was reasonably to be anticipated as a hazard.” Id. at 294, 317 P.2d at 1092. In affirming the district court’s judgment, this court explained that the plaintiff was “entitled to rely upon the feet that [the protective screen was] . . . provided for her safety and [she was not] . . . contributorily negligent in failing to check” its functionality. Id. at 295, 317 P.2d at 1093. Because Berrum was decided before the enactment of Nevada’s comparative negligence statute, however, and it did not thoroughly consider the issue of “duty,” it provides little guidance here.

 See James L. Rigelhaupt, Jr., Annotation, Liability to Spectator at Baseball Game Who Is Hit by Ball or Injured as Result of Other Hazards of Game, 91 A.L.R.3d 24 (1979) (electronically updated as of 2008).

 Schneider v. American Hockey, 777 A.2d 380, 384 (N.J. Super. Ct. App. Div. 2001) (internal quotation marks and citation omitted).

 Id.

 Benejam v. Detroit Tigers, Inc., 635 N.W.2d 219, 223 (2001).

 Id.

 Id.

 Cf. Harrington v. Syufy Enters., 113 Nev. 246, 249, 931 P.2d 1378, 1380 (1997) (recognizing that recovery is barred under a duty to warn theory “when the danger is obvious, not because the negligence of the plaintiff is greater than that of the defendant, but because the defendant is not negligent at all.”).

 Benejam, 635 N.W.2d at 223.

 Schneider v. American Hockey, 777 A.2d 380, 384 (2001).

 See Butler v. Bayer, 123 Nev. 450, 461, 168 P.3d 1055, 1063 (2007) (establishing that summary judgment is appropriate in a negligence action where no duty exists). The dissent reasons that summary judgment is inappropriate because the limited duty rule does not extend to areas outside of the stands, such as the Beer Garden. In reaching this determination, the dissent applies the limited duty rule to the stands but then concludes that traditional negligence principles apply to other areas of the ballpark. In doing so, the dissent creates a “shifting or moveable duty of care,” which is triggered by the plaintiff’s unilateral and volitional decision to move between parts of the stadium. Maisonave v. Newark Bears, 881 A.2d 700, 716 (N.J. 2005) (Rivera-Soto, J., concurring in part and dissenting in part). In our view, the defendant’s duty should not change at the plaintiff’s impulse, and only one duty of care should apply with respect to the general “peril of objects leaving the playing field.” Id. at 717. Following this approach, the 51s satisfied the applicable duty of care by providing sufficient protected seating under the limited duty rule; thus, the district court properly entered summary judgment in the 51s’ favor.

 See Maisonave, 881 A.2d at 704-05 (“Even a brief review of several early baseball cases reveals that many courts that adopted the [limited duty] rule, or a version of it, based their decisions on two facts: that the danger of errant *220 balls was common knowledge and that spectators sitting in unscreened seats assumed the risk of injury.”); Morris v. Cleveland Hockey Club, 105 N.E.2d 419, 424 (Ohio 1952) (“The baseball rule is bottomed upon the postulate that the risks of batted and flying balls are so obvious that they must be perceived and known by those who attend the game, and, therefore, such risks are assumed as a matter of law by such persons”).

 103 Nev. 259, 737 P.2d 1158 (1987).

 Id. at 264, 737 P.2d at 1161.

 Davenport v. Cotton Hope Plantation, 508 S.E.2d 565, 569-71 (S.C. 1998); cf. Mizushima, 103 Nev. at 262, 737 P.2d at 1160.

 See Davenport, 508 S.E.2d at 571 (recognizing that “secondary” implied assumption of risk arises where “the plaintiff knowingly encounters a risk created by the defendant’s negligence”).

 Id. at 570.

 103 Nev. at 264 n.7, 737 P.2d at 1161 n.7 (emphasis added). Notably, the Mizushima court used the example of a foul ball hit into the stands as an example of this principle. Id.

 Id.

 Lee v. GNLV Corp., 117 Nev. 291, 295, 22 P.3d 209, 212 (2001); see Butler v. Bayer, 123 Nev. 450, 461, 168 P.3d 1055, 1063 (2007) (“Because the existence of ‘duty’ is a question of law, if this court determines that no duty exists, it will affirm summary judgment for the defendant in a case involving negligence.”).

 Davenport, 508 S.E.2d at 570; See Foronda v. Hawaii Intern. Boxing Club, 25 P.3d 826, 836 (Haw. Ct. App. 2001) (“There being no legal duty to breach, there can be no talk of negligence, . . . and thus, primary implied assumption of risk remains a discrete and complete defense quite apart from comparative negligence.”); Armstrong v. Mailand, 284 N.W.2d 343, 348 (Minn. 1979) (“primary assumption of the risk remains as an absolute bar to the plaintiff’s recovery, whereas secondary assumption of the risk becomes a question of comparative negligence”).

 See Davenport, 508 S.E.2d at 570; Armstrong, 284 N.W.2d at 348 (“[p]rimary assumption of the risk is not really an affirmative defense; rather, it indicates that the defendant did not even owe the plaintiff any duty of care”).

 See Davenport, 508 S.E.2d at 571 (noting that “express and primary implied assumption of risk are compatible with comparative negligence”).

 We also overrule Mizushima to the extent that it treated the determination of duty in negligence cases as a factor left to the jury in the comparative negligence analysis. 103 Nev. at 264 n.7, 737 P.2d at 1161 n.7. As we reiterated in Lee v. GNLV Corp., “the question of whether a ‘duty’ . . . exists is a question of law solely to be determined by the court.” 117 Nev. at 295, 22 P.3d at 212. To this end, a court must first decide that a duty exists before a jury can decide “[w]hether the defendant has failed to act reasonably in the particular circumstances.” Auckenthaler v. Grundmeyer, 110 Nev. 682, 688, 877 P.2d 1039, 1043 (1994).

 Cf. Gunlock v. New Frontier Hotel, 78 Nev. 182, 185 n.1, 370 P.2d 682, 684 n.1 (1962) (concluding that appellant’s claim for loss of consortium “was dependent upon the success of his wife’s claim . . . [and] [h]er claim not having been established, his must fail as well”).

 See Moon v. Guardian Postacute Services, Inc., 116 Cal. Rptr. 2d 218, 220-21 (Ct. App. 2002) (explaining that “NIED is a tort in negligence, and the plaintiff must establish the elements of duty, breach of duty, causation, and damages”).